2022 IL App (2d) 200459-U
No. 2-20-0459
Order filed January 31, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of DeKalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-706 |
| DAVID WALLS, | ) ) ) | Honorable Robbin Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: In this first-degree murder case, defense counsel did not provide ineffective assistance in declining to request a second-degree murder instruction. The trial court erred in allowing a lay witness to testify to the manner in which gun-shot residue can be removed, but the error was harmless. The remainder of defendant's arguments challenging his conviction are forfeited. Finally, the trial court did not abuse its discretion in sentencing defendant to 50 years' imprisonment. Affirmed.

¶ 2    The State charged defendant, age 18 at the time of the offense, with four counts of first-degree murder in the shooting death of Debrece Shields in that defendant intended to kill, intended to do great bodily harm, knew that his acts created the strong probability of death, and knew that his acts created a strong probability of bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2016). The

State prosecuted defendant on the theory that he was the shooter and sought a sentencing enhancement based on the allegation that defendant personally discharged the firearm that caused Shields's death. A jury convicted defendant of first-degree murder, and the trial court sentenced him to 50 years' imprisonment, which included a 25-year enhancement for personally discharging the firearm that caused Shields's death.

¶ 3    On appeal, defendant argues that: (1) defense counsel was ineffective for failing to pursue jury instructions on second-degree murder; (2) the trial court erred in allowing improper lay opinion testimony, to which defense counsel objected at trial and in a posttrial motion, concerning the manner in which gunshot residue can be removed; (3) the trial court erred in allowing improper lay opinion testimony, to which defense counsel did *not* object, concerning the collection of fingerprints and the improper narration of a surveillance video; (4) the State improperly bolstered codefendant's testimony during redirect examination; (5) the State made improper remarks in opening statements and closing argument; (6) the jury instructions regarding the elements of first-degree murder omitted the language "intends to kill" and were, therefore, plainly erroneous; and (7) defendant's 50-year sentence is excessive in that the trial court did not did not adequately consider his youth, mental-health conditions, or rehabilitative potential.

¶ 4    For the reasons that follow, we disagree that defense counsel was ineffective. We agree that the trial court erred in allowing a lay witness to testify to the manner in which gunshot residue can be removed, but we determine that the error was harmless because there is no reasonable probability that the jury would have acquitted defendant absent the error. Defendant's remaining challenges against his conviction are forfeited, and the errors, if any, do not amount to plain error. Finally, the trial court did not abuse its discretion in sentencing defendant to 50 years' imprisonment. Accordingly, we affirm.

¶ 5                                         I. BACKGROUND

¶ 6      In its opening statement, the State introduced its theory of the case to the jury by stating: "[W]e all know that unfortunately there are neighborhoods where illegal and violent activity are a common occurrence, and those neighborhoods are places that we avoid going." The State continued that, on October 6, 2016, the parking lot of the apartment complex located at 810 and 820 Kimberly drive in DeKalb near Northern Illinois University (NIU) "became one of those places." The State informed the jury that defendant did not live in DeKalb. Rather, codefendant Nico Griggs drove him and two other men to DeKalb in his tan Jeep to purchase marijuana from Shields. Defendant went into Shield's red car to perform the transaction and, as they both exited the car from the driver's side, defendant shot Shields in the back. The defense responded by encouraging the jury to look for gaps in the State's evidence, inconsistencies in witness testimony, and bias in the State's key witness, Griggs.

¶ 7                     A. Physical Descriptions of Shields and the Suspect

¶ 8      LaDonna English, Shields's mother, testified that a photograph presented by the State represented an accurate image of her son shortly before his death. The photograph showed Shields to be an African American man with long dreadlocks. He was 25 years old.

¶ 9      The State presented two witnesses who, after hearing shots fired, saw a suspect move from Shields's body to the tan Jeep: Tilly-Ana Ceriser (an NIU graduate student living at the Kimberly apartments) and Emily Cavazos (an NIU patrol officer). The State also presented a surveillance video and still-frame photograph purporting to capture an image of the suspect (Exhibit Nos. 27 and 28, testified to by DeKalb police detective Keith Ehrke).

¶ 10      Ceriser, an NIU graduate student, testified that she lived in a second-floor unit of the Kimberly apartments. At approximately 10:30 p.m., she had been inside her apartment talking to

her friend on the phone. She heard a "crackling" sound, like a firecracker. She initially thought the sound had something to do with NIU football festivities, such as a mock cannon. Then, she heard a second firing and saw a white flash. She did not walk over to the window immediately, but she did so within 30 seconds. She looked out and saw a man trying to get into a tannish-colored, four-seat vehicle, shouting, "Open up the door. Open up the door." She could not see the man's face or his skin color. However, she saw that he was wearing a dark-colored hoodie, red boxers, and white pants. The man got in the tan vehicle, and it drove away. She also saw the victim laying on the ground of the parking lot next to his car, with the car door still open. Very shortly thereafter, the police arrived.

¶ 11    On cross-examination, Ceriser conceded that she could not be sure of the suspect's height. She estimated his height to be between 5 feet, 9 inches and 6 feet, 1 inch. He was "not heavyset." She did not see him with a weapon.

¶ 12    Cavazos, an NIU patrol officer, testified that she and Nicole Folz were on foot patrol near the area of the shooting. She heard a "loud pop," which she thought was either a gunshot or fireworks. The sound came from the north, in the parking lot of the Kimberly apartments. She noticed a red car, idling. She heard two more "loud popping sounds." She could see flashes of light and smoke coming from behind the red car. A group of young women who had been sitting on the apartment stoop told Cavaso and Folz that there was a male lying on the ground on the other side of the red car, and the young women believed that he had been shot. Cavazos and Folz began moving toward the red car. Cavazos saw "a black male individual move from behind the red vehicle into the direction of a *** light brown or tan SUV-style vehicle." The tan SUV was not in a parking space. The suspect was "running" toward the vehicle, he got inside, and the vehicle

drove west. She was not able to take note of the suspect's clothing or face. Her view was partially obstructed by vehicles in the parking lot.

¶ 13    After going to the red car, Cavazos saw Shields, bleeding from his mouth and chest. He had a faint pulse. She notified dispatch of the shooting and the tan vehicle and returned her attention to Shields. Shields had stopped breathing, so Cavazos began chest compressions until the DeKalb Fire Department arrived and took over.

¶ 14    Cavazos noticed that there was a bullet casing on Shields's chest. She also saw a small bag of cannabis and some keys. She did not see a gun anywhere near the scene.

¶ 15    On cross-examination, Cavazos testified that the suspect was African American and appeared to have "long dreadlock-styled hair, but I wasn't entirely sure." Still, Cavazos agreed that she mentioned the dreadlocks in her police report. Cavazos also testified that, unlike Ceriser, she did not hear the suspect yell to open the door to the tan SUV. On redirect examination, Cavazos clarified that the young women on the stoop had not given a physical description of the suspect. In addition, Cavazos viewed the State's Exhibit No. 26, an excerpt from the surveillance video at the Kimberly apartments and confirmed that it accurately portrayed the parking lot area.

¶ 16    The State presented one video (Exhibit No. 27) and one still frame shot (Exhibit No. 28) of the suspect. Exhibit Nos. 27 and 28 came from a surveillance camera at the Kimberly apartments. DeKalb police detective Keith Ehrke viewed the surveillance video on the night of the incident. It aided his investigation, because he was able to slow down the video:

> "When I put it in a slower speed, I was able to see two individuals coming out of the driver's door, one down probably about his hands and knees with the second individual behind him. I was able to see the clothing description of the second individual, specifically

being light-colored pants, dark hooded sweatshirt and some pink or orange underwear or undergarments between the pants and the sweatshirt."

The State played Exhibit No. 27, a slow-motion version of the surveillance video, for the jury. At times, the State paused the video to question Ehrke:

"Q. All right, sergeant, what's happening now?

A. The victim's vehicle the red Nissan is pulling forward and stopping.

Q. What do you see here?

A. The driver's door opening.

Q. And what do you see here?

A. So right there I see an individual that's bent forward. The individual behind that person is wearing light-colored pants, he's got like a dark hooded sweatshirt or shirt on. It might be hard to see right there but he actually has a little bit of pink or orange on the back underwear and his arm is extended downwards towards the first individual that's on his hands and knees what appears [*sic*].

Q. And so you're saying that the person with the light-colored pants is the one whose arm is extended downward?

A. That's correct.

Q. That's what you're able to determine from the video.

A. Yes, yes.

Q. And is it that same person you're saying that had light-colored pink or something also on his clothing?

A. Yeah. It was like light-colored pants and then there's like a very small almost like a triangle section of either pink or orange but it appears to be his underwear.

Q. And by slowing it down you were able to see that a little bit clearer?

A. Yes.

(People's Exhibit No. 27 continued to be played.)

BY MS. COLLINS:

Q. And what does it show that the person is doing now?

A. It appears that they both moved to the back of the car.

Q. What next?

A. Again they're out of view. You see some moving around during this part but you can't really see what's going on back there."

Defense counsel did not object to Ehrke's description of the video, Exhibit No. 27.

¶ 17    The State then asked Ehrke to identify a still-frame shot extracted from the video, Exhibit No. 28.  Ehrke agreed that the still-frame shot "truly and accurately depict[ed] the slower version close-up of the video that [the jury] just watched from the DeKalb mobile cam[era]."  He did not otherwise comment on the still-frame shot.  The State then sought to admit Exhibit No. 28.  Defense counsel objected: "[T]hat still photo [is] not the best evidence.  They have the video."  The trial court admitted the still-frame shot over defense counsel's objection.  This court has viewed Exhibit No. 28.  Though blurry, Exhibit No. 28 does appear to show a suspect in white pants and a dark top, with a bright pink/orange/reddish color between the pants and top, bent over another individual.  Both individuals are outside the driver's door of a red car.

¶ 18    During cross-examination, Ehrke agreed that he watched the surveillance video for the first time *after* interviewing Ceriser.  Ceriser had provided Ehrke with a description of the suspect's clothing.  The images captured in Exhibit Nos. 27 and 28 were the only available images of the suspect.

¶ 19 Finally, Ehrke testified that he used buccal swabs to obtain defendant's and Griggs's DNA. Ehrke did not believe that the DNA of any other suspect was taken.

¶ 20                    B. Codefendant Nico Griggs Testifies to the Incident

¶ 21 Griggs testified that he was the driver of the tan Jeep involved in the shooting. That night, Griggs's friend of two years, Norris Davison, asked Griggs to drive him to several stops for the purpose of procuring marijuana. Davison would pay Griggs in the form of gas money, and Griggs agreed. First, Griggs picked up Davison in Chicago. Then, Griggs drove Davison to a different location in Chicago. Davison left the car to purchase marijuana and came back with defendant, whom Griggs had never met before. Next, Griggs drove Davison to a 7-Eleven in DeKalb. There, Davison's cousin, whom Griggs also had never met before and whom Griggs knew only as "Head," joined the group.

¶ 22 The original seating arrangement was Griggs in the driver's seat, Davison in the front-passenger seat, and defendant and Head in the back seats. After leaving the 7-Eleven, Griggs drove Head to his apartment, because Head had forgotten to lock his apartment door. At Head's apartment, only Head left the Jeep. After Head returned to the Jeep, Griggs drove the group to a second apartment, hoping to purchase marijuana. The group was not successful. However, in the parking lot of the second apartment, the group switched seating arrangements.

¶ 23 The new seating arrangement was Griggs in the driver's seat, defendant in the front-passenger seat, and Davison and Head in the back seat. Griggs then drove to the Kimberly apartments. Head had arranged to purchase marijuana there. Head made the arrangements over the phone; Griggs did not know whom they were meeting. Griggs pulled into a parking space, and he saw a red car pull into the aisle and idle. Davison and Head told defendant to get out of the car to purchase the marijuana. Griggs saw defendant get into the red car. He heard a shot. Then, a

few seconds later, he heard a second shot. He started the Jeep and was about to pull away when defendant got back in the front-passenger seat of the Jeep. Griggs recounted:

"I was going to pull off and then [Davison and Head] was like, no, don't leave [defendant] and then we looked around for him, he came, hopped in. After he hopped in[,] I pulled out, pulled out of the parking lot. Head was giving me directions on where to go and as he was giving me directions they asked him what happened. *He said that the guy tried to up a gun*." (Emphasis added.)

¶ 24    Griggs repeated defendant's words upon getting into the Jeep:

"Q. What did he say?

A. He said that the guy tried to up on him and he shot him.

Q. What does—he says somebody tried to up on him, what does that mean?

A. Tried to pull a gun on him.

Q. Did the defendant David Walls provide any description of the gun that was pulled on him, that he claimed was pulled on him?

A. Yes. He said it was big and chrome.

Q. And just to be clear, after the defendant David Walls said that 'He tried to up on me,' he said that—David Walls said 'I shot him?'

A. Yes."

¶ 25    During cross-examination, Griggs agreed that, on the date of the incident, he and Davison both had long dreadlocks. Griggs's dreadlocks were "long[,] somewhere down [his] back ***." Davison's dreadlocks were "about the same length." Griggs also agreed that, on the date of the incident, he had a picture on his cellular phone of one of the two guns that the police later found outside his Jeep, the Stalker gun. The gun belonged to Davison. Griggs had taken a picture of it,

because he was trying to help Davison sell it. Prior to the shooting, however, Griggs was not aware that anyone in the Jeep had a weapon.

¶ 26    Griggs addressed the change in seating arrangements that had occurred at the second apartment complex. Davison had asked to change seats, because his foot hurt. Davison had recently been shot in the foot, and his foot started locking up. Davison thought that the back seat had more room, so he went to the back seat and defendant went to the front-passenger seat.

¶ 27    Griggs clarified that, although he heard two shots, he did not see anything. Griggs did not hear defendant yell to open up the door. Defendant was able to get into the Jeep, because the doors were unlocked.

¶ 28          C. Codefendant Nico Griggs Testifies to His Deal with the State

¶ 29    On direct examination, Griggs acknowledged that he had testified pursuant to an agreement with the State. He had been charged with first-degree murder under an accountability theory, which carried a sentencing range of 20 to 60 years, and aggravated unlawful use of a weapon, which carried a sentencing range of 1 to 3 years. If Griggs testified truthfully, as determined by the State, the State would dismiss the first-degree murder charge. At the time of his testimony, Griggs had already pled guilty to the weapons charge and received an agreed sentence of 3 years.

¶ 30    On cross-examination, Griggs testified that, when he first spoke with the police in 2016, he asked for an attorney. It was not until May 29, 2019, that he signed an agreement with the State. He was represented by counsel, and his counsel also signed the agreement. He has had conversations with the State "about [his] testimony here today." He anticipated that he would be released shortly after giving the instant testimony. The agreement could be voided if the State determined that Griggs did not testify truthfully. Griggs understood that the State was trying to convict defendant. Griggs further agreed that when he told the police that defendant shot Shields,

Griggs knew defendant had been arrested and Davison and Head had left the scene; they were "gone." Griggs did not know defendant, but he knew Davison.

¶ 31   On redirect-examination, Griggs agreed that he had made a prior consistent statement to Detective Ehrke. Specifically, on February 6, 2019, three months prior to signing an agreement with the State, Griggs provided Ehrke with an account of the incident that was consistent with his trial testimony.

¶ 32   D. Deputies James Eklund and Doug Brouwer Testify to Defendant's Apprehension

¶ 33   Eklund testified that, on the date of the incident, he was employed by the DeKalb County Sheriff's Office as a patrol officer. At approximately 10:30 p.m., he had just come off a contract shift at a local community college and was still in uniform and driving his patrol car when he saw a tan Jeep, with emergency flashers blinking, on the side of Peace Road. Eklund decided to see if the occupants of the Jeep needed help. One man, who he later determined to be Griggs, was starting to exit the driver's seat. Three other subjects were already outside the Jeep, standing on the passenger side. He spoke with Griggs, who told him that their vehicle had run out of gas. Griggs declined help and explained that two of his friends were going to get gas. While Eklund was speaking with Griggs, two of the other subjects walked away, heading north on Peace Road. Eklund got back in his vehicle and drove toward the other two subjects to see if they would like a ride. The subjects were walking in a ditch beside the road. It was dark, and there were no streetlights. Eklund could not see their faces or their clothing. He asked them if they would like a ride. They responded, but their response was inaudible. Eklund assumed they did not want help and kept driving. At this time, Eklund was not suspicious of the subjects.

¶ 34   After Eklund drove away, he heard through dispatch that a tan Jeep had been involved in a DeKalb shooting. Eklund decided to return to speak to the occupants of the Jeep again. When he

returned to the Jeep, he noticed that the two remaining occupants, Griggs and defendant, were outside and to the north of the Jeep. Griggs and defendant were walking back toward the Jeep and Eklund observed that Griggs wore a dark-colored shirt and dark-colored pants and had long dreadlocks. Defendant had a dark-colored sweatshirt, white or light-colored pants, and had short hair.

¶ 35    By this time, Deputy Marks (first name not stated) had arrived to assist Eklund. Marks spoke with Griggs, and Eklund spoke with defendant. Both Griggs and defendant denied any knowledge of a shooting in DeKalb. Defendant told Eklund that they had been in DeKalb to visit a girl. Defendant provided his identification. Defendant did not make eye contact, his hands were restless, and he was sweating "a little bit."

¶ 36    Deputy Doug Brouwer then arrived on the scene. Brouwer informed Eklund and Marks that he found two guns on the side of the road, a Stalker and a Beretta. He found them 10 to 15 feet from the passenger side of the Jeep. On this information, Eklund and Marks took defendant and Griggs into custody. Eklund checked defendant for weapons and found none. He handcuffed defendant and put him in the back of the squad car. Eklund again mentioned that defendant was sweating: "He's starting to sweat profusely on his forehead area"; and "He was sweating quite a lot so I turned my air-conditioning on [in the squad car]."

¶ 37    Eklund then reviewed Exhibit Nos. 74 and 75, videos of the initial encounter and arrest. Exhibit No. 74 showed the view from the outside of Eklund's squad car. The video showed Eklund's squad car heading north on Peace Road. As Eklund approached the Jeep for the first time, the driver of the Jeep can be seen exiting. Three other subjects can be seen on the other side of the Jeep: "one with light-colored pants which would be [defendant] and two others that were in dark clothing that were the ones that had walked away." Later, the video showed the squad car

slowing; this was the moment that Eklund spoke to the two individuals walking in the ditch. Those individuals were not captured on film, because the camera could not turn to the side.

¶ 38    Exhibit No. 75 showed the interior of Eklund's squad car following defendant's arrest. Defendant had been placed in the squad car. However, because the air conditioning was running, defendant's comments were inaudible. Eklund recounted that the conversation involved Eklund checking on defendant's comfort and "ke[eping] defendant up to speed on what [the police] were doing, letting him know, stuff like that basically." Defendant is visibly sweating in the squad car video.

¶ 39    During cross-examination, Eklund agreed that, when he initially pulled over alongside the Jeep, defendant stood the furthest back and to the rear of the Jeep as compared to the other two subjects. He also agreed that Exhibit No. 74 shows that a person other than defendant is possibly wearing light-colored, but *not* white, blue jeans. Only the person's leg can be seen. (That person can be seen at the same time as defendant, so it cannot be defendant.) Still, Eklund thought that the two subjects walking in the ditch had on dark clothing. He did acknowledge that he could not see or hear the two subjects walking in the ditch very well.

¶ 40    Last, Eklund testified that, at the time that he arrested defendant, he did not yet have a physical description of the suspect. Brouwer, however, testified that, by the time of defendant's apprehension, he had received a dispatch report concerning a possible shooting and had been given a description of the tan Jeep *and* "an African American with dreadlocks."

¶ 41         E. Detective Michael Stewart Testifies to His Interview with Defendant,

Specifically Addressing Gun Shot Residue

¶ 42    Michael Stewart, a detective for the DeKalb Police Department (retired at the time of trial), interviewed defendant. Defendant waived his Miranda rights on a written form time-stamped at

1:37 a.m. on October 7, 2016. The State played a recorded, excerpted portion of Stewart's interview with defendant for the jury, Exhibit No. 12. Defendant can be seen fidgeting throughout the video. He put his arms and hands inside his shirt, and Stewart asked him if he wanted a blanket. Substantively, defendant denied being in DeKalb that evening.

¶ 43    On cross-examination, Stewart agreed that defendant was of "large build," approximately 6 feet, 2 inches tall, with short hair. (Indeed, defendant's arrest warrant states that he is 6 feet, 2 inches tall, and 198 pounds.) Defense counsel then questioned Stewart about the interview, specifically asking him to address the topic of gunshot residue:

"Q. *** [Y]ou were talking to him as though you had a lot of the answers. Would that be fair, it's an investigative technique?

A. On some things, yes.

* * *

Q. And you had told him that at that point he had already had gunshot residue. Do you recall that?

A. Told him that somebody had collected a gunshot residue test from him, yes.

Q. And that was from Mr. Walls; is that correct?

A. Yes.

Q. So you knew that had been done at that point?

A. Yes.

Q. And you did not have the results at that point; correct?

A. No.

Q. But you told him as soon as those results came in *it would resolve all doubt*; correct?

A. Yes.

Q. And he had told you that he didn't know anything; correct?

A. Correct." (Emphasis added.)

¶ 44    On redirect-examination, the State returned to the topic of gunshot residue:

"Q. Now, detective, you were asked about telling the defendant that tests would remove all doubt. Were you specifically saying that the gunshot residue test would remove all doubt?

A. No. I was saying specifically as an investigative tool that DNA that would be collected could potentially remove all doubt along with GSR, gunshot residue, and other evidence.

Q. And the gunshot residue test [was] administered to the defendant's hands; correct?

A. Correct.

Q. And you didn't know the results at the time you were interviewing the defendant?

A. No.

*Q. If a person had gunshot residue on their hands and they were sweating excessively, would that affect the ability to collect gunshot residue from their hands?*

*A. Yes.*

MR. DIXON: Objection.

THE COURT: Overruled.

A. (Continuing.) Yes.

BY MS. KLEIN:

*Q. Could a person also rubbing their hands on fabric or putting their hands in their pockets remove gunshot residue from their hands?*

*A. Yes.*" (Emphasis added.)

¶ 45                    F. Detectives and Forensic Experts Testify to Defendant's Clothing

¶ 46    The following police officers, detectives, and forensic experts testified to the evidence recovered from defendant's clothing: Brian Bollow, Stewart, Angel Reyes, Blake Aper, and Laurie Lee. Bollow, a DeKalb police officer, participated in booking defendant. During booking, Bollow removed defendant's shoes and hoodie. This was a standard safety procedure; the laces and strings were a safety risk. Bollow placed the shoes and hoodie in an evidence locker. On cross-examination, Bollow agreed that he did not notice anything unusual about defendant.

¶ 47    Stewart, who had interviewed defendant, also photographed and collected defendant's clothing. Defendant's shoes and hoodie had already been taken during the booking process by Bollow. Stewart reviewed the photographs he had taken. Exhibit No. 14 showed an image of defendant from the rear. Defendant wore his pants low; Stewart did not direct him to do so. Defendant's white pants and orangish underwear can be seen. Exhibit No. 15 showed a spot of blood on his white pants near the kneecap. The spot is small and was later described by forensics as being 1/16 of an inch.

¶ 48    Angel Reyes, a detective with the DeKalb Police Department, testified that he observed defendant's clothing, which had been packaged by Stewart. Reyes observed a "red dot" on the white pants, which appeared to be blood. Reyes also observed that the front toe and the front-right side of the inner sole of the left shoe appeared to have blood on it. The jury was shown the actual pants and shoes as well as photographs of the same.

¶ 49    Aper, who was accepted as an expert in the field of forensic biology, testified that he tested defendant's pants and shoes for blood. On the pants, he noticed several "small" reddish brown spots. On one of the more prominent spots (still only 1/16 of an inch), Aper performed a preliminary test to confirm that the substance was blood. He did not test each spot, because the lab does not have the resources to do so. He also performed a preliminary test on the shoes. Upon learning that the stains on the pants and the shoes were in fact blood stains, he extracted samples and sent them to the lab for DNA testing.

¶ 50    Lee, who was accepted as in expert in the field of DNA analysis, performed a DNA test on the samples extracted from defendant's pants and shoes. The DNA from the blood stains on the pants had two contributors. The major contributor, for whom all 24 points typically tested on the DNA profile were found, was Shields. The minor contributor, for whom only 2 of the 24 points typically tested on the DNA profile, was possibly defendant, *i.e.*, "[Defendant] could not be excluded from having contributed to the minor profile." Nico Griggs was excluded from having contributed to the minor profile on the pants. The DNA profile from the blood stain on the shoes had one contributor, Shields.

¶ 51    During cross-examination, Lee agreed that she could not discern whether the source of the minor profile was blood or saliva or a different bodily fluid. Moreover, she *expected* to find portions of defendant's profile, because the material came from his pants. "They were the person's pants so we would expect their profile." She never received a DNA sample from Davison, so she could not rule him out as a contributor to the minor profile. Lee further agreed that DNA could be transferred from one person to another, that the DNA profile would not change if the DNA was "shaken off" a metal object (and onto another surface), and that she did not know how the DNA in this case got on the pants and shoes.

¶ 52                    G. Detectives and Forensic Experts Testify to Other Evidence

¶ 53    Reyes testified that he processed the crime scene.  There were not big pools of blood on the ground.  He did, however, find a bullet casing on the ground outside the red car.  He also found a shell casing in the center console of the car.  The State submitted photographs of other items collected in and around the red car, which Reyes recognized.  In particular, Exhibit Nos. 45 and 49 showed a set of keys, a baggie of marijuana, a swisher sweets package, and a cell phone.  No gun was found outside the car.

¶ 54    The red car was towed to the police station and processed there.  Along the driver's side door, there were two small red drops, which appeared to be blood.  These drops were not tested, however.  No gun was located in or about the vehicle.

¶ 55    Reyes also observed Shields's autopsy.  He observed Shields's clothing being removed. Shields had been wearing black pants and a black sweatshirt.  Exhibit No. 71 shows the shirt that Shields wore when shot.  A small amount of blood circles the tear made by the bullet.  No gun was found in Shields's clothing.  Shields's DNA was taken at the autopsy.

¶ 56    On cross-examination, Reyes testified that, when he arrived at the scene, the red car was still running, but the doors were closed.  The interior and exterior of the car were dusted for fingerprints.

¶ 57    On redirect, Reyes testified that no fingerprints were found on the car.  The State asked Reyes why "there may not be fingerprints from a vehicle that people were obviously in."  Defense counsel did not object to Reyes's qualifications to answer the question, but the trial court asked the State to lay a foundation.  Before answering the question, Reyes testified that he had taken three classes on evidence collection, which covered the retrieval of fingerprints.  Reyes then

explained that fingerprints might not be found on a dusty surface, a frequently touched surface, or when there was not enough oil on a person's hands.

¶ 58 On recross examination, Reyes testified that the red car had an "average" amount of dust on it. Reyes again stated that no prints had been found, even though they had tested the car "inside and out" to "identify anybody that would possibly [have been] in that vehicle."

¶ 59 Erick Lambert, the property manager at the Kimberly apartments, testified that he found a bullet the day after the shooting. He found the bullet in the stairwell to the lower apartments. He picked it up. Upon realizing what it was, he put it back down and called the police. He found the bullet after students had held a vigil at the apartment complex.

¶ 60 Detectives Reyes, Doug Brouwer, Josh Duehning, and Jackie Lane each testified to the chain of custody of the two guns that were found near the tan Jeep on Peace Road. The State did not present any evidence that the guns were tested for fingerprints.

¶ 61 Christina Davison (not related to Norris Davison), a forensic scientist specializing in firearms identification, testified that the two fired cartridge cases that she received were fired by the Beretta. The casing that she had received also came from the Beretta. It was impossible to tell from which gun the bullet core came. During cross-examination, Davison agreed that she saw nothing in the lab records to indicate that the gun had been tested for DNA or fingerprints. When asked about gunshot residue, Davison declined to answer. She stated that gunshot residue was outside her area of expertise. She stated that there were experts specifically tasked to analyze gunshot residue.

¶ 62 The State then presented a stipulation regarding gunshot residue. That is, if called to testify, DeKalb Police detective Mark Nachman would testify that he performed a gunshot residue test on Griggs and defendant. He performed the tests on October 7, 2016, at 12:22 a.m. and at 12:30 a.m.,

respectively, and sent the samples to the labs. Scott Rochowicz, a forensic scientist with the Illinois State Police and, as stipulated, an expert in gunshot residue testing, performed the lab analysis. The results as to both Griggs and defendant were:

> "The test indicated that [Griggs/Defendant] may not have discharged a firearm with either hand and that if [Griggs/Defendant] did discharge a firearm, then the particles of gunshot residue were removed *by activity*, were not deposited[,] or were not detected by the procedure." (Emphasis added.)

¶ 63                    H. Mitra Kalekar Testifies to Shields's Autopsy

¶ 64    Mitra Kalekar, who performed Shields's autopsy, testified that there were two gunshot wounds; one of entrance and one of exit. The entrance wound was on the right upper back. It was round and regular. Soot near the wound indicated that it was a contact-range firing, meaning that the muzzle of the gun was touching Shields when the shot was fired.

¶ 65    The exit wound was on the left front chest wall. There was "a lot" of internal bleeding. Both chest cavities were full of blood. The toxicology reports tested positive for marijuana and a "small" amount of alcohol. The alcohol was in Shields's urine, not his blood. Shields was not under the influence of alcohol at the time of death.

¶ 66    During cross examination, Kalekar clarified that Shields died of single gunshot wound. There were no other gunshot wounds. Kalekar would expect fluid to "come out" of the wound when a person is shot at contact range. However, the muzzle of the gun would have "jammed" the fluid. Also, the human back does not have major blood vessels. Shields's bleeding came from the lungs and the heart. Kalekar might have expected blood droplets on the muzzle of the gun.

¶ 67                            I. Defendant's Case

¶ 68    Folz testified consistent with Cavazos that, while on foot patrol near the Kimberly apartments, she heard one "loud pop."  She and Cavazos began walking in the direction of the noise.  Within one minute, they had walked to a view of the Kimberly apartments.  Shields's red car was about 50 feet from them.  She saw three young women on the apartment stoop.  She also saw a flash of light from behind the red car and heard two more pops.  She saw a man in a crouched position get up and run over to a tan SUV.  He got in the passenger side of the SUV, and it reversed and then drove west.  She saw the man from his profile.  She thought that the man had "something about his head, either dreadlocks or a long hood."  In her report, she wrote that the suspect possibly had long dreadlocks.  She did not write anything about a hood.

¶ 69    On cross-examination, Folz agreed that she had been a relatively new officer at the time, the area was not well-lit, and she only saw the suspect for a short time.  The next day she told Detective Brad Carls of the DeKalb County Sheriff's Office that the suspect wore *either* dreadlocks or a hood.  On redirect examination, Folz agreed that there were lights on the apartment buildings surrounding the parking lot, and the lights shone down on the parking lot.

¶ 70                                    J. Closing Arguments

¶ 71    In closing, the State argued: "Now, ladies and gentleman, it has been said that the jury is the conscience of the community.  The acts that defendant performed on the unarmed Debrece Shields that night were utterly unconscionable."  The State told the jury that the evidence showed that defendant was the shooter, because "the person who did this had white pants on [and] defendant was the *only one in white pants*."  (Emphasis added.)  The State also emphasized that the surveillance video shows the shooter wearing bright colored underwear, and defendant wore bright colored underwear.  Further, the State noted, Shield's blood was found on defendant's pants

and shoes. The State also commented that there were small spots of blood in the car and on the ground by the car.

¶ 72    Defense counsel stressed gaps in the State's evidence and Griggs's bias. As to gaps in the State's evidence, counsel noted that the NIU patrol officers, Cavazos and Folz, did not ask for the names and contact information of the three young women standing on the apartment stoop who may have witnessed the shooting. Counsel found it noteworthy that the State did not account for Davison or Head in its closing argument. Cavazos and Folz believed the suspect to have dreadlocks like Griggs and Davison. The police allowed Davison and Head to "walk away" and did not test them for gunshot residue or other forensic evidence. On the flipside, no fingerprints or gunshot residue connected defendant to the crime. While defendant had a small amount of blood on his pants and shoes, defense counsel pointed to Lee's testimony that blood and DNA can be transferred from one person to another. Counsel further argued that Griggs was a biased witness who did not come forward to implicate defendant until nearly three years after the shooting and only then to his own great benefit.

¶ 73    In rebuttal, the State addressed defense counsel's point that no gunshot residue connected defendant to the crime:

> "Well, you saw for yourselves this defendant *** even before he was in the squad car fidgeting around, putting his hands in his pockets ***, and then you also saw him in the squad car sweating profusely with the sweat literally running down his face and his skin, both of which can remove gunshot particles."

The State also argued:

> "Defense counsel just told you that we can't tell you how the blood got onto David Walls's *hands*. Well, we most certainly can tell you how the blood got on David Walls's

*hands*. That blood got onto David Walls's *hands* when David Walls took this gun, the Beretta, and put it against Debrece Shields's back and pulled the trigger. That is how the blood got onto his *pants*." (Emphases added.)

Finally, the State told the jury that, although this case was "real life," in Hollywood, the murder "would be called an execution."

¶ 74                                    K. Jury Instructions and Verdict

¶ 75    The trial court provided the jury with the Illinois Pattern Jury Instructions (IPI) Criminal Nos. 7.01 ("Definition of First Degree Murder") (4th ed. 2000) and 7.02 ("Issues in First Degree Murder," *i.e.*, the elements instruction) (4th ed. 2000) both orally and in writing. The definition instruction, the State's Instruction No. 19, perfectly mirrored the language of IPI Criminal No. 7.01, providing:

> "A person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death, *he intends to kill or do great bodily harm* to that individual or he knows that such acts create a strong probability of death or great bodily harm to that individual." (Emphasis added.)

¶ 76    However, the elements instruction, the State's Instruction No. 20, omitted the phrase "intended to kill," from the second proposition in IPI Criminal No. 7.02, providing:

> "To sustain the charge of first-degree murder, the State must prove the following propositions:
>
> First Proposition: That the defendant performed the acts which caused the death of Debrece Shields; and

Second Proposition: That when the defendant did so he *intended to do great bodily harm* to Debrece Shields or he knew that his acts created a strong probability of death or great bodily harm to Debrece Shields.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.)

¶ 77 Had the elements instruction perfectly mirrored the language in the IPI Criminal No. 7.02, the second proposition would have read:

"Second Proposition: That when the defendant did so, *he intended to kill or do great bodily harm* to Debrece Shields ***." (Emphasis added.) IPI Criminal No. 7.02.

¶ 78 Next, in orally instructing the jury on the firearm enhancement, the trial court stated that, to sustain the firearm enhancement, the State had to prove that "during the commission of the offense of *attempt* first-degree murder the defendant personally discharged a firearm that proximately caused death to another person." (Emphasis added.) After the court dismissed the jury, it informed the attorneys that it had misspoken, and it should not have read the word "attempt." The attorneys agreed that the jury would receive a written correction. In the written instructions for the firearm enhancement, the trial court provided the jury with the correct instructions and the court crossed out the word "attempt." The jury found defendant guilty of first-degree murder and of personally discharging the firearm that caused Shields's death.

¶ 79                                   L. Posttrial Motion

¶ 80    On April 17, 2020, defense counsel filed a written posttrial motion. He argued, *inter alia*, that the trial court erred in allowing an officer (Stewart), who was not qualified as an expert, to opine that gunshot residue could be removed by sweat. This testimony went beyond the parties' stipulation to the expert's (Rochowicz's) finding regarding gunshot residue. The trial court denied the motion.

¶ 81                                       M. Sentencing

¶ 82    The presentencing report provided that, at the time of the offense, defendant was 18 and had just graduated from high school. He had participated in a summer jobs program and he planned to go to community college. Defendant's father was currently in federal prison for a drug-related offense. Defendant described his neighborhood as "real wild" due to drugs and gun violence. Defendant also stated that nearly one-third of his friends were involved in crime. However, defendant himself had no criminal history, either as an adult or a juvenile. Defendant had previously been diagnosed with bipolar disorder, schizophrenia, and attention deficit hyperactivity disorder. He had used drugs in the past, including alcohol, cannabis, and ecstasy. Defendant reported that, on the date of the offense, he had "smok[ed] and popp[ed] pills." Defendant expressed condolences to Shields's family, stating that they must feel "disappointed, hurt, emotional, terrible, and [feelings] words cannot describe" and stating that he "regret[ted] what happened."

¶ 83    At the sentencing hearing, the State requested a term of 60 years. It noted that the sentencing range for first-degree murder was 20 to 60 years, plus a 25-to-life term for the firearm enhancement. The State submitted the victim impact statements. It also noted that, in addition to the information contained in the presentencing report, defendant had been named as a respondent

in an order of protection at the time of the offense. This was relevant because it would have precluded him from possessing a gun.

¶ 84 Defense counsel sought the minimum sentence, 45 years (20 years, plus 25 years for the firearms enhancement). He and defendant were unaware of any order of protection. He stressed that defendant had no criminal history and was very young, just 18, at the time of the offense. He also noted that defendant suffered from mental-health issues and had expressed great empathy for Shields's family. Finally, he asked the court to consider "some of the residual doubt" as to defendant's guilt.

¶ 85 Defendant made a statement in allocution, again expressing his condolences to Shields's family. However, defendant stated that he was innocent and that he regretted having gotten in the car that day.

¶ 86 The trial court sentenced defendant to 50 years' imprisonment, to be served at one hundred percent. The court stated that it considered "many factors." It remarked specifically on defendant's age:

> "[Defendant] at the time of this offense had just turned 18 and I have to consider that as well. If it had been 17 when he committed this offense, I would be looking at many different factors as well that the Courts have required as the years have gone by to be considered, so I have to look at what I have in front of me as a young man of 18 years old."

The court noted that, even if it imposed the minimum sentence, defendant would be an older man upon release. The court stated that it had read the presentencing report and it commented that defendant grew up without a father. It also noted that, ordinarily, defendants standing before it ready to be sentenced for first-degree murder have a lengthy criminal history, often "pages" "going on and on," and, here defendant had no criminal history. It appreciated defendant's assertion of

innocence, but it stated that a jury had determined otherwise. Finally, the court also observed: "[Y]ou committed this crime and took this life for no reason at all, none that I can even fathom." Defendant did not file a motion to reconsider sentence. This appeal followed.

¶ 87                                  II. ANALYSIS

¶ 88    On appeal, defendant argues that: (1) defense counsel was ineffective for failing to pursue jury instructions on second-degree murder; (2) the trial court erred in allowing improper lay opinion testimony concerning the manner in which gunshot residue can be removed; (3) the trial court committed plain error in allowing improper lay opinion testimony concerning the collection of fingerprints and the narration of a surveillance video; (4) the trial court committed plain error when it allowed the State to improperly bolster codefendant's testimony during redirect examination; (5) the trial court committed plain error when it allowed the State to make improper remarks in opening statements and closing argument; (6) the jury instructions regarding the elements of first-degree murder omitted the language "intends to kill" and were, therefore, plainly erroneous; and (7) defendant's 50-year sentence is excessive.

¶ 89                        A. Ineffective-Assistance Claim:

Declining to Request Second-Degree Murder Instructions

¶ 90    Defendant argues that defense counsel provided ineffective assistance of counsel when he failed to request an instruction for second-degree murder. Defendant contends that the evidence supported the instruction because Griggs testified that, immediately after the shooting, defendant told the occupants of the tan Jeep that Shields had tried to pull a "big and chrome" gun on him. According to defendant, Griggs's testimony constituted the only evidence regarding the reason for the shooting. Additionally, defendant notes that, although only two bullet casings were found at the scene, Cavazos and Folz testified to hearing three shots. Also, although no gun was found at

the scene, several objects that defendant may have mistaken for a gun—a lighter, a cell phone, and a cigar package—were found near the scene. Had defense counsel requested second-degree murder instructions, and had the jury subscribed to that theory, defendant would have been subject to a significantly lower sentence. The sentencing range for second-degree murder is 4 to 20 years. 730 ILCS 5/5-4.5-30 (West 2016).

¶ 91 Defense counsel provides ineffective assistance where: (1) counsel's performance fell below an objective standard of reasonableness; and (2) the defendant was prejudiced as a result of counsel's performance in that there is a reasonable probability that the result would have been different but for counsel's error. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Defense counsel has wide latitude in making tactical decisions and there is a presumption that counsel's conduct was the product of sound trial strategy. *Id*. at 689. As such, decisions that involve matters of trial strategy typically will not sustain a claim of ineffective assistance. *People v. Sanchez*, 2014 IL App (1st) 120514, ¶ 30.

¶ 92 "A person commits the offense of second degree murder when he or she commits the offense of first degree murder *** and either of the following mitigating factors are present: (1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or (2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing ***, but his or her belief is unreasonable." 720 ILCS 5/9-2(a) (West 2016). The second mitigating factor, which is at issue here, has become known as "imperfect self-defense." *People v. Jeffries*, 164 Ill. 2d 104, 129 (1995).

¶ 93    Once the State has proved the elements of first-degree murder beyond a reasonable doubt, the defendant may prove by a preponderance of the evidence that he believed the circumstances justified the killing, although his belief was unreasonable.  720 ILCS 5/9-2(c) (West 2016). Second-degree murder is a not a lesser-included offense of first-degree murder, because second-degree murder requires proof of the same elements as first-degree murder.  *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 39.  Rather, second-degree murder is a lesser-mitigated offense of first-degree murder.  *People v. Manning*, 2018 IL 122081, ¶ 18.

¶ 94    A requested second-degree murder instruction should be given even where the evidence supporting the theory is very slight.  *People v. Goods*, 2016 IL App (1st) 140511, ¶ 50.  Counsel may request a second-degree murder instruction even if that theory is in conflict with other evidence.  See, *e.g.*, *People v. Everette*, 141 Ill. 2d 147, 156 (1990).  Assuming for the sake of analysis that a second-degree murder instruction would have been given had defense counsel so requested, we focus our analysis on whether defense counsel provided ineffective assistance in declining to do so.

¶ 95    In requesting an instruction on a lesser-mitigated offense, defense counsel necessarily decides against an all-or-nothing strategy in favor of providing the jury with a "middle way" that could still result in a conviction.  *People v. Edmundson*, 2018 IL App (1st) 151381, ¶ 37; *People v. DuPree*, 397 Ill. App. 3d 719, 735 (2010).  Defendant concedes that the decision to request an instruction on a lesser-mitigated offense is typically one of strategy.  See, *e.g.*, *Edmundson*, 2018 IL App (1st) 151381, ¶ 40 (the decision to request a second-degree murder instruction belongs to defense counsel).  The decision not to request an instruction on a lesser-mitigated offense may not be reasonable trial strategy, however, when the omitted instructions would be consistent with the theory of defense at trial or when counsel's decision is based on a misapprehension of the law.

*Goods*, 2016 IL App (1st) 140511, ¶ 57; *People v. Lemke*, 349 Ill. App. 3d 391, 399 (2004). Defendant argues that both are the case here. We disagree.

¶ 96    Defendant's reliance on *Goods*, 2016 IL App (1st) 140511, is misplaced. In *Goods*, defense counsel was ineffective for failing to request self-defense instructions despite pursuing a *consistent* but invalid defense theory of compulsion. *Id*. ¶¶ 54, 57. In this case, second-degree murder instructions would have been *inconsistent* with the defense theory of misidentification, leaving the decision of whether to request the instruction squarely in the realm of trial strategy. Indeed, we note that in certain portions of his brief, defendant concedes that second-degree murder instructions would have been inconsistent with the defense theory of misidentification.

¶ 97    Defendant next argues that counsel's decision to pursue an all-or-nothing strategy of misidentification was based on a misapprehension of the law. He asserts that defense counsel did not appear to consider that, even if the jury believed that someone else shot Shields, defendant still could have been found guilty under a theory of accountability. Defendant discusses the factors used to consider accountability, *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996), and notes that defendant was in the car used as a getaway vehicle, maintained a common association with the other occupants of the car, failed to report the crime, misled the police as to his whereabouts, and was found near the gun used to shoot Shields.

¶ 98    Defendant's accountability argument is misplaced, however, because the State prosecuted him under the theory that he was the principal shooter and never argued at trial that he could be guilty under a theory of accountability. Indeed, a defendant cannot be convicted under an accountability theory if the State does not pursue an accountability theory at trial. *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 97.

¶ 99    Defendant argues in his reply brief that the risk of providing the jury with an instruction inconsistent with the defense theory at trial is not so great as the State suggests. Rather, as the jury would never be in a position to convict defendant of second-degree murder unless it had already found him guilty of first-degree murder, there was no downside to offering the jury the lesser-mitigated option. In support, he cites to *People v. Wilmington*, 2013 IL 112938, ¶ 20, where defense counsel's decision to request second-degree murder instructions was in conflict with the defense theory of innocence. Specifically, defense counsel questioned the reliability of the defendant's statement to police and pursued a theory of innocence. *Id*. However, in closing, he "briefly referenced" the second-degree murder instructions to be given and explained that, although he believed defendant to be innocent, "if it's anything, it's second-degree murder." *Id*. On appeal, the defendant argued that the trial court should have asked the defendant if he personally agreed with counsel's request to give the instruction. *Id*. ¶ 44. The supreme court rejected that argument. *Id*. It noted that the defendant did *not* raise an ineffective-assistance claim, but it nevertheless observed that counsel was able to have the jury instructed on second-degree murder "without really arguing for it." *Id*. ¶ 50.

¶ 100    Defendant fails to recognize that a holding that arguably *approves* of defense counsel taking such an approach is not the same as a holding that *requires* defense counsel to take such an approach. In *Wilmington*, the supreme court merely observed that defense counsel exercised a strategy to have the jury instructed on second-degree murder while maintaining defendant's innocence. It did not hold that, in all cases, this would be the required strategy. Here, not only would a second-degree instruction have been inconsistent with defense counsel's theory of misidentification, but also with the physical evidence. Though Griggs testified that defendant told him that Shields "tried to up on him" with a "big chrome gun," no such weapon was found at the

scene. Defendant's *appellate* theory that defendant may have mistaken other items found on the scene—a lighter, a cell phone, or a cigar package—is speculative. Further, the close contact shooting of Shield's in the back is similarly inconsistent with an argument that a lighter, cell phone or cigar package prompted the shooting. Per valid *trial* strategy, defense counsel focused on a misidentification theory and elected not to pursue an inconsistent mitigated defense.

¶ 101 For these reasons, defense counsel was not ineffective for declining to request a second-degree murder instruction.

¶ 102 　　　　　　　　B. Lay Witness Testimony: Stewart and Gunshot Residue

¶ 103 Defendant next argues that the trial court erred when it allowed Stewart to testify as to how gunshot residue can be removed without first accepting him as an expert witness. Illinois Rule of Evidence 701 provides that a lay witness's testimony, opinions, and inferences are limited to those which are "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness's determination of the issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011). In turn, Illinois Rule of Evidence 702 provides that a witness must be qualified as an expert in order to testify to scientific, technical, or other specialized knowledge that will aid the trier of fact. Ill. R. Evid. 702 (eff. Jan. 1, 2011). The admission of evidence is reviewed for an abuse of discretion. *People v. Taylor*, 2011 IL 110067, ¶ 67. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the court. *People v. Edwards*, 343 Ill. App. 3d 1168, 1183 (2003). For the reasons that follow, we agree that the trial court erred in allowing the gunshot residue testimony from a lay witness, but we determine that the error was harmless.

¶ 104   Testimony concerning the specific manner in which gunshot residue can be removed such that a person who fired a gun may nevertheless test negative for gunshot residue falls under Rule 702 because it concerns scientific, specialized knowledge.  The case law is replete with examples of gunshot residue experts who have scientific training in gunshot residue.  See, *e.g.*, *People v. Allison*, 236 Ill. App. 3d 175, 190-191 (1992) (a chemist with a Ph.D. who had read multiple scientific articles on gunshot residue, had performed 60 gunshot residue tests, and had been qualified as an expert in gunshot residue 10 to 12 times was qualified as an expert in gunshot residue, though he had never taken a gunshot residue course); *People v. Cole*, 170 Ill. App. 3d 912, 928-29 (1988) (police department chemist who had performed 300 gunshot residue tests to establish baseline levels to use as testing guidelines was qualified as an expert in gunshot residue, though his gunshot residue course took place in a single day); see also *People v. Brown*, 2020 IL App (1st) 190828, ¶ 35 (anecdotally, the gunshot residue expert who testified that gunshot residue particles could be removed by sweat was a trace chemist); *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 25 (a forensic scientist stated that wind, moisture, and friction from brushing up against something were the types of activities that could prevent gunshot residue from being deposited); and *People v. Munoz*, 398 Ill. App. 3d 455, 467 (2010) (anecdotally, the gunshot residue expert who testified to, *inter alia*, gunshot residue transfer was a trace evidence analyst employed by the Illinois State Police crime lab).

¶ 105   Here, as the State acknowledges, it did not seek to qualify Stewart as an expert before eliciting his scientific testimony.  Nor is this case like *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 111, where the foundational testimony elicited from the officer at trial would have resulted in him being accepted as an expert had the State so moved.  *Id*. (officer's testimony about his training and experience in narcotics investigations would have qualified him as an expert to

testify regarding the drug trade). Rather, this case is more like *People v. Moody*, 199 Ill. App. 3d 455, 462-63 (1989), where the State failed to establish that the officer was an expert in the area of gunshot residue analysis based on the officer's testimony that his experience was limited to the administration of the test and he learned of the test result from others who analyzed the swabs.

¶ 106    While it may be possible to infer from Stewart's testimony that he, as the State puts it, "spent decades investigating and collecting evidence from crime scenes, which would have included incidents involving guns," this is not enough to establish him as a gunshot residue expert. Stewart did not testify that he was trained to administer or analyze gunshot residue testing. Unlike the experts in *Allison*, *Cole*, *Brown*, *Anderson*, *Munoz*, or even the stipulated expert in the instant case—Rochowicz—Stewart was not a chemist or trace evidence analyst working in a crime lab.

¶ 107    Moreover, contrary to the State's assertion, defense counsel did not invite the error, and the State certainly capitalized on it in closing argument. Under the invited-error doctrine, a defendant cannot claim error in the admission of improper evidence where the defendant procured, invited, or acquiesced to the admission. *People v. Alvarado*, 2013 IL App (3d) 120467, ¶ 11. "To permit a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal 'would offend all notions of fair play' [Citation], and 'encourage defendants to become duplicitous' [Citation]." *People v. Harvey*, 211 Ill. 2d 368, 385 (2004).

¶ 108    To be sure, defense counsel questioned Stewart briefly and in a general manner regarding gunshot residue. The context is as follows. During Stewart's direct examination, the State played an excerpt of Stewart's interview with defendant, Exhibit No. 12. In the relatively brief substantive portion of the interview, defendant denies all involvement in the shooting, denies knowing about the shooting, and denies being in DeKalb that evening. In response to defendant's denials, Stewart informs defendant that he knew defendant had been at the scene of the shooting. He tells defendant

that there are cameras everywhere and that officers would collect defendant's DNA and had performed a gunshot residue test; soon they would know the truth. Stewart told defendant that he was giving defendant a chance to explain *why* the shooting occurred.

¶ 109 Concerning this excerpt from the interview, defense counsel engaged in the following colloquy with Stewart on cross-examination:

"Q. *** [Y]ou were talking to him as though you had a lot of the answers. Would that be fair, it's an investigative technique?

A. On some things, yes.

\* \* \*

Q. And you had told him that at that point he had already had gunshot residue. Do you recall that?

A. Told him that somebody had collected a gunshot residue test from him, yes.

Q. And that was from Mr. Walls; is that correct?

A. Yes.

Q. So you knew that had been done at that point?

A. Yes.

Q. And you did not have the results at that point; correct?

A. No.

Q. But you told him as soon as those results came in *it would resolve all doubt*; correct?

A. Yes.

Q. And he had told you that he didn't know anything; correct?

A. Correct." (Emphasis added.)

¶ 110   Contrary to the State's position, this line of questioning did not invite Stewart to testify to a scientific explanation as to the absence of gunshot residue.  Rather, defendant's response to Stewart's comment that the test results would resolve all doubt was elicited to show the strength of defendant's denial.  The defendant was told that, if he was the shooter, the gunshot residue test would prove it, yet knowing this, he continued to deny all involvement.

¶ 111   Moreover, even if defense counsel's cross-examination did somehow invite further questioning on the general topic of gunshot residue, it was sufficient for the State to elicit on redirect, as it did, that Stewart meant that "DNA that would be collected could *potentially* remove all doubt along with GSR, gunshot residue, and other evidence." (Emphasis added.)  By continuing further to have Stewart inform the jury that gunshot residue could be removed from a person's hands by sweating, rubbing one's hands on fabric, or putting one's hands in his pockets, the State elicited improper scientific testimony that was not invited.

¶ 112   In considering the likely harm caused by this improper evidence, we note that the State capitalized on Stewart's improper testimony, stressing exhibits that showed defendant participating in the specific activities that Stewart testified could remove gunshot residue.  In closing, the State remarked: "Well, you saw for yourselves this defendant *** even before he was in the squad car fidgeting around, putting his hands in his pockets ***, and then you also saw him in the squad car sweating profusely with the sweat literally running down his face and his skin, both of which can remove gunshot particles."  In this way, Stewart's improper testimony was not merely cumulative to the general stipulation that gunshot residue could be removed by activity.

¶ 113   However, we nevertheless determine that the admission of Stewart's testimony was harmless, because we do not believe there is a reasonable probability that it affected the outcome of the trial.  The error at issue concerns the Rules of Evidence 701 and 702.  An evidentiary error

is harmless where there is no reasonable probability that the jury would have acquitted the defendant absent the error. *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (citing *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990)).

¶ 114   Here, without Stewart's testimony that gunshot residue can be removed by sweating and rubbing one's hands in one's pockets, the jury would have been left with a stipulation that defendant's gunshot residue test was negative and that gunshot residue can be removed by "activity."  The other properly admitted evidence against defendant was strong.  For example, the evidence showed that defendant was one of the four people in the tan Jeep associated with the shooting.  The murder weapon was found within feet of the tan Jeep.  Defendant was the only person in the tan Jeep wearing white pants.   Exhibit No. 28, the still-frame shot from the surveillance video, shows that the suspect was wearing white pants, orangish underwear, and dark top.  Defendant was apprehended shortly after the shooting just outside the tan Jeep wearing white pants, orange underwear, and a dark hoodie.  Defendant had the victim's blood on his pants and shoes.  Although the amount of blood on defendant's pants was small, just 1/16 of an inch, Kalekar, who performed the autopsy, explained that, when a victim is shot at contact range in the back (an area of the body without major blood vessels), she would not expect to see a lot of blood.  Kalekar further testified that Shields bled internally.  Consistent with Kalekar's testimony that Shields's bleeding was internal, Reyes testified that there was not a lot of blood at the scene.  Critically, the shirt worn by Shields shows only a small amount of his blood circling the tear made by the bullet.

¶ 115   We appreciate that Griggs benefitted greatly in testifying against defendant.   We also appreciate that both Cavazos and Folz initially reported that the shooter had dreadlocks, and that Davison, a man with dreadlocks, was allowed to walk away from the tan Jeep before any forensics were collected from him.  However, both Cavazos and Folz later hedged on their impression that

the shooter had dreadlocks, saying that it could have been a hoodie. In actuality, Shields had dreadlocks and defendant had short hair. Ceriser, whose visual impression was confirmed by the still-frame shot, never reported that the shooter had dreadlocks. Additionally, Ceriser's impression that the shooter was as tall as 6 feet, 1 inch and "not heavyset" was consistent with defendant's actual frame of 6 feet, 2 inches and 198 pounds. As with all the witness testimony, deciding whether to credit Ceriser's testimony was within the province of the jury. See *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 116   Finally, we recognize that the forensic evidence was not as conclusive as the State might have hoped. The gunshot residue test was, after all, negative. The gun was not tested for fingerprints. However, we do not subscribe to defendant's theory that the small amount of the Shields's blood on defendant's pants and shoes was somehow exculpatory. That Shields's blood was on defendant's pants and shoes is highly inculpatory. As we have already discussed, that Shields himself exhibited only a small amount of external bleeding explains why the shooter would have had only a small amount of Shields's blood on himself, especially where, as shown by the surveillance video, he fled immediately and did not otherwise interact with Shields's body.

¶ 117   In short, the evidence as well as gaps in the evidence favoring defendant are speculative, *i.e.*, *maybe* a shooter other than defendant transferred what little blood came from Shields's body to defendant's pants and shoe. In contrast, much of the evidence favoring conviction is certain. Defendant was certainly one of four people in the tan Jeep when Eklund first encountered the group. The murder weapon was located near the tan Jeep associated with both defendant and the shooting. Defendant was certainly the only one of those four people wearing white pants. Exhibit No. 28, the still-frame shot, certainly showed the shooter wearing the same unique constellation of clothing as defendant, including white pants and orangish underwear. Defendant certainly had

Shields's blood on his pants and shoes. For these reasons, we *cannot* say that there is a reasonable probability that the jury would have acquitted defendant if it had heard only that activity in general—as opposed to perspiring or rubbing one's hands on clothing specifically—can remove gunshot residue.

¶ 118                          C. Lay Witness Testimony: Reyes and Ehrke

¶ 119    Defendant argues that the trial court erred when it allowed improper lay witness testimony from Reyes regarding the collection of fingerprints and from Ehrke regarding the narration of the surveillance video. Defendant acknowledges that these arguments, as well all of his remaining arguments, are forfeited for failure to object at trial and in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, defendant requests that we review these arguments under either the plain-error doctrine or as an ineffective-assistance claim. Plain error applies when: (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant *or* (2) a clear and obvious error occurred and that error was so serious that it affected the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Defendant argues that prong-one plain error applies in both instances. He also argues, in the alternative, that defense counsel was ineffective for failing to object and to preserve the error. Again, defense counsel provides ineffective assistance where: (1) counsel's performance fell below an objective standard of reasonableness; and (2) the defendant was prejudiced as a result of counsel's performance in that there is a reasonable probability that the result would have been different but for counsel's error. *Strickland*, 466 U.S. at 694. For the reasons that follow, we disagree.

¶ 120                          1. Reyes and Fingerprints

¶ 121   Defendant argues that the trial court erred in allowing Reyes to testify to why there were no fingerprints on Shields's red car even though people had "obviously" been in it. Reyes testified that dust or the absence of oil on a person's fingers could negatively affect the officers' ability to collect fingerprints. On cross-examination, Reyes reiterated that the car was tested for fingerprints "inside and out" because the police wanted to "identify *anybody* that would possibly [have been] in that vehicle," but no fingerprints were found. (Emphasis added.)

¶ 122   Any error here was harmless. First, unlike Stewart, who did not testify to his qualifications to testify to gunshot residue, Reyes testified that he had taken three evidence courses covering the retrieval of fingerprints. See, *e.g.*, *Loggins*, 2019 IL App (1st) 160482, ¶ 111 (improper lay opinion may be harmless error if the witness would have been accepted as an expert by the trial court if so tendered). Moreover, the substance of Reyes's testimony was not damaging to defendant's case such that the alleged error threatened to tip the scales of justice against defendant. The absence of fingerprint evidence in the car does not prove defendant was not in the car, though it did allow defendant to argue that a shooter other than defendant was in the car. Indeed, Reyes's ultimate conclusion that *no* fingerprints were recovered advantaged defendant.

¶ 123                              2. Ehrke and Exhibit No. 27

¶ 124   Defendant also argues that the trial court erred in allowing Ehrke to narrate the events shown on Exhibit No. 27, the surveillance video. Under the silent-witness theory, a surveillance video may be introduced as substantive evidence so long as a proper foundation is laid. *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 34. The evidence speaks for itself. *Id*. As the State concedes, a lay witness, such as Ehrke, should not testify to a matter of which he has no personal knowledge when the jury can just as easily draw its own inferences and conclusions. *Freeding-Skokie Roll-Off Service Inc. v. Hamilton*, 108 Ill. 2d 217, 221 (1985). In *Sykes*, for example, the court

determined that it was error to let the store's loss prevention manager testify that the surveillance video depicted the defendant removing money from the cash register. *Sykes*, 2012 IL App (4th) 111110, ¶ 42. Instead, since the video was less than three minutes long (and there were no efficiency issues in having the jury watch the entire video), the defendant was the only person depicted in the video, and the only question was whether defendant removed money from the cash register, the store manager invaded the province of the jury when he told it that the video showed defendant removing money from the cash register. *Id*.

¶ 125 Here, Ehrke informed the jury that, as part of his investigation, he watched the surveillance video in slow motion. Ehrke told the jury that the video showed a suspect in light-colored pants and orangish underwear, which was similar to the clothing defendant was apprehended in. The jury also watched the video in slow motion. We agree with defendant that Ehrke had no personal knowledge of the suspect's clothing. He did not witness the crime. While Ehrke should have let the jury decide whether the video showed a suspect in light or white pants and orangish underwear, we determine defendant was not prejudiced. Exhibit No. 28, the still-frame shot from the video, which defendant does *not* challenge on appeal, shows the suspect in white pants and orangish underwear. While it might have been unfair to tell a jury that the *moving* image they saw was of a man in a certain color of clothing, Ehrke did not similarly narrate for the jury that the *static*, still-frame shot created from that same video showed a suspect in white pants and orangish underwear. Considering Exhibit Nos. 27 and 28 together, Ehrke's commentary did not amount to plain error and counsel was not ineffective for failing to object.

¶ 126 D. Allegedly Improper Comments by the State

¶ 127 Defendant argues that the State committed "prosecutorial misconduct" by misstating the evidence and using inflammatory remarks to pit the jury against defendant during opening

statements and closing arguments. Our supreme court has alternatively held that whether a prosecutor's misstatements and improper remarks denied defendant of a fair trial is reviewed for an abuse of discretion (*People v. Blue*, 189 Ill. 2d 99, 128 (2000)) and *de novo* (*People v. Wheeler*, 226 Ill. 2d 92, 121 (2007)). Defendant acknowledges that defense counsel did not object to the statements and, thus, the claim is forfeited. He requests, however, that we review the error under the plain-error doctrine or as an ineffective assistance claim. Under either of these analytic frameworks, and notwithstanding which standard of review we apply, we conclude that defendant received a fair trial.

¶ 128 It is improper to misstate the evidence or argue facts not in evidence. *People v. Green*, 2017 IL App (1st) 152513, ¶ 77. Defendant argues that the State misstated the evidence in at least three instances. First, defendant complains that, in closing argument, the State asserted that, as captured in the surveillance video, the shooter was wearing white pants and "defendant was the *only one in white pants*." (Emphasis added.) Defendant contends that this is not true, because Eklund's squad-car video, Exhibit No. 74, shows that one other person in the tan Jeep wore light colored pants. Additionally, one of the Kimberly apartment surveillance videos, Exhibit No. 26, shows one, and possibly two, person or persons in the vicinity wearing white pants.

¶ 129 Though the State's assertion that defendant was the only one in white pants was highly incriminating, we disagree that the State misstated the evidence on this point. The person depicted in the squad-car video, Exhibit No. 74, appears to be wearing light colored pants, but no reasonable person would say they were white. They appear rather to be ordinary blue jeans. While the person or persons depicted in one of the Kimberly apartment surveillance videos may be wearing white pants, it is clear that neither of these persons are the shooter and we do not believe that the jury would have been confused on this point. One of these persons exits the apartment complex alone,

puts a garbage bag in the Dumpster, gets in his car, and drives away. The other person exits the apartment complex to wave down police. In context, when the State asserted that defendant was the only one wearing white pants, the State meant that defendant was the only one in the tan Jeep wearing white pants. This was not a misstatement.

¶ 130   Second, defendant complains that the State referred to spots of blood on the ground of the crime scene, when the red stains were not, in fact, chemically tested. However, it was reasonable to infer from the evidence that the red stains found near the victim's body were blood when the victim was known to have been shot. See, *e.g.*, *People v. Glasper*, 234 Ill. 2d 173, 212 (2009) (State may argue reasonable inferences that are based on the evidence). It was also reasonable to infer from the evidence that the shooter stepped on the red substance on the ground and got it on his shoe. Accordingly, it follows that the State's argument was entirely proper that the shooter was defendant because the substance on defendant's shoe was the victim's blood.

¶ 131   Third, defendant argues that the State misstated the evidence when it stated that defendant had "blood on his hands." In fact, defendant did not have anything on his hands. The State contends on appeal that it had merely used a figure of speech. Arguably, such a figure of speech is problematic in a case where a shooter's identity is at issue and defendant's hands were indeed examined without success for forensic evidence. In any event, in our view, the transcripts read as though the State inadvertently misspoke rather than purposefully misstated the evidence; the State immediately corrected itself to reference blood on defendant's pants, as opposed to his hands; and the State's comment did not affect the fairness of defendant's trial.

¶ 132   Next, defendant complains that the State resorted to inflammatory and prejudicial remarks that created an "us versus them" dynamic between the jurors and defendant in opening statements and closing arguments. Specifically, the State informed the jury, in its opening statement that

"there are neighborhoods [and] places that we avoid going," that the 800 block of Kimberly Drive in Dekalb "became one of those places." The State also told the jury, in its closing argument, that the jury was the "conscience of the community," that defendant committed an "unconscionable act," and that the shooting was an "execution."

¶ 133   We recognize that the State must be careful to focus the jury's attention on the legal issues at hand and should not resort to inflammatory or prejudicial remarks. *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 64. However, on balance, allegedly inflammatory remarks do not warrant reversal unless they were the result of deliberate misconduct or subjected defendant to substantial prejudice. *People v. Smith*, 141 Ill. 2d 40, 63 (1990). Moreover, here, we are examining the State's comments for plain error and must consider whether the evidence was so closely balanced that any of these remarks tipped the scales of justice against defendant. *Herron*, 215 Ill. 2d at 178-79.

¶ 134   In this case, there were legitimate reasons for the State to reference the neighborhood in which the crime took place—it believed the evidence would show that defendant came to an apartment complex near a college campus to buy drugs. And, as we have already discussed, the evidence was not closely balanced. As such, even assuming for the sake of analysis that the comment referring to the shooting as an execution was ill-advised, the comments taken together were not of such an inflammatory character as to affect the outcome of defendant's trial.

¶ 135                    E. Griggs's Prior Consistent Statement

¶ 136   Defendant argues that the State improperly bolstered Griggs's testimony during redirect examination. Specifically, the State elicited a prior consistent statement that, although Griggs entered into his agreement with the State in May 2019, he first implicated defendant as the shooter in February 2019. Defendant acknowledges that he did not object at trial and the argument is, therefore, forfeited. He again asks that we review the error under the plain-error doctrine or as an

ineffective-assistance claim. We again determine that, under either of these frameworks, there was no reversible error, certainly no plain error, and defendant did not suffer the requisite prejudice.

¶ 137   Prior consistent statements are not admissible on direct examination, because they unfairly bolster a witness's credibility. *People v. Terry*, 312 Ill. App. 3d 984, 995 (2000). A trier of fact is more likely to believe something that is repeated. *Id.* However, a prior consistent statement is admissible to rebut the inference that the witness was motivated to testify falsely, so long as the motive did not exist at the time of the prior consistent statement. *People v. Lambert*, 288 Ill. App. 3d 450, 453 (1997).

¶ 138   Here, the parties dispute when a witness's motive to curry favor with the State comes into existence such that the witness can be said to have had the same motive at the time he made the prior consistent statement that he had when he testified at trial. Defendant, citing two cases from the First District, argues that motive may arise as soon as the witness knows that he is a suspect in the case. See, *e.g.*, *Terry*, 312 Ill. App. 3d at 995 (because the witness had a motive to give misinformation when first interviewed by police as a potential suspect, his prior consistent statement from that interview could not be offered to rebut the inference that he was motivated to testify falsely at trial); *People v. Grisset*, 288 Ill. App. 3d 620, 627 (1997) (because the defendant had a motive to fabricate a claim of self-defense at the time of his arrest, a prior consistent statement from that time could not be used to rebut the inference that he was motivated to testify falsely at trial).

¶ 139   However, as noted by the State, our supreme court has affirmed evidentiary rulings to the contrary. In *People v. Powell*, 53 Ill. 2d 465, 475 (1973), for example, the supreme court determined that a codefendant's prior consistent statement was admissible to rebut the inference

that the codefendant testified falsely to secure a lenient sentence. In that case, the codefendant made the prior consistent statement after the murder weapon had been found in his car but before the State had made any offer of leniency. *Id*. at 469-470. Since then, this court has followed suit. In *Lambert*, 288 Ill. App. 3d at 456, this court determined that a prior consistent written statement to police was admissible to rebut the inference that the codefendant testified falsely in exchange for leniency. In that case, two officers affirmatively testified that no deal was made with the codefendant in exchange for the initial written statement. *Id*. at 452.

¶ 140 Here, on cross-examination, defense counsel elicited the inference that Griggs falsely implicated defendant to secure the dismissal of his first-degree murder charge. The State was permitted to rebut this inference. Per *Powell* and *Lambert*, any general motive that Griggs may have had to curry favor with the State in February 2019 is not necessarily the "same motive" that Griggs had in May 2019 and at trial when he had been offered leniency. There was no indication in the record that an offer of leniency had been made at the time that Griggs gave his February 2019 statement. As such, we cannot say that, had defendant objected, the trial court would have abused its discretion in admitting the statement. Rather, the weight to be given to the statement and to Griggs's testimony at trial would be for the jury to determine.

¶ 141 In addition, we certainly cannot say that a plain error occurred or that counsel's failure to object amounted to ineffective assistance. Even an improperly admitted prior consistent statement cannot be considered plain error when the State references only the existence of the prior consistent statement and does not attempt to use it substantively. See, *e.g.*, *People v. Crayton*, 175 Ill. App. 3d 932, 949 (1988). Here, as in *Crayton*, the State merely referenced the existence of the February 2019 statement. It did not attempt to read the contents to the jury, use it substantively, or stress it in closing argument. *Cf. Terry*, 312 Ill. App. 3d at 996 (error in admitting the prior consistent

statement was exacerbated where the State stressed it in closing); *Lambert*, 288 Ill. App. 3d at 457 (prior consistent statement was admissible for rehabilitative purposes but could not be used substantively). Thus, even if the jury had been informed of the February 2019 statement in error, and we do not believe it was, defendant did not suffer the requisite prejudice.

¶ 142                          F. Jury Instruction Nos. 19 and 20

¶ 143    Defendant argues that he was deprived of a fair trial when, in Instruction No. 20, the trial court deviated from the language contained in the standard IPI Criminal No. 7.02 elements instruction for first-degree murder, by omitting the phrase "intended to kill" from the second proposition. Defendant acknowledges that the trial court properly instructed the jury in Instruction No. 19 when it gave the jury the standard IPI Criminal No. 7.01 definition instruction for first degree murder, which included the phrase "intends to kill." Defendant contends, however, that the discrepancy between Instruction Nos. 19 and 20 "created an irreconcilable conflict," left the jury uninformed of each of the four ways that defendant had been charged, and otherwise confused the jury. Defendant also acknowledges that defense counsel did not object to the instructions and, thus, the claim is forfeited. He urges, however, that we review the error under the plain-error doctrine or as an ineffective assistance claim. We disagree that any discrepancy in the instructions confused the jury or otherwise prejudiced defendant and, so, we decline to do so.

¶ 144    The purpose of jury instructions is to provide the jury with the correct statement of law which it should apply to the evidence to reach a proper verdict. *People v. Parker*, 223 Ill. 2d 494, 500 (2006). The reviewing court must determine whether the instructions, taken as a whole, fairly and comprehensively apprise the jury of the relevant legal principles. *Id*. at 501. "It is sufficient if the series of instructions, considered as a whole, fully and fairly announce the law applicable to the respective theories of the [State] and the defense." *People v. Kolep*, 29 Ill. 2d 116, 125 (1963).

Jury instructions are generally reviewed for an abuse of discretion. *People v. Green*, 2017 IL App (1st) 152513, ¶ 61. However, the question of whether an instruction or set of instructions correctly conveyed the law is reviewed *de novo*. *Id.*

¶ 145   We determine that Instruction Nos. 19 and 20, construed together as part of the larger body of instructions, correctly informed the jury of the law. The law provides: "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: (1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(1), (2) (West 2016). All of this information was conveyed in Instruction No. 19. Contrary to defendant's position, Instruction No. 20, which provides that, to sustain the charge of first-degree murder, the State must prove that defendant "intended to do great bodily harm," does not conflict with Instruction No. 19, which provides that a person commits first degree murder if he "intends to kill or do great bodily harm."

¶ 146   We also reject defendant's argument that Instruction Nos. 19 and 20 failed to inform the jury of each of the four ways defendant had been charged. We agree that jury instructions should confine the jury's attention to the theories that the State sought to prove. *People v. Elhert*, 274 Ill. App. 3d 1026, 1037-38 (1995). Here, defendant was informed, through the charging instrument, discovery process, and pretrial proceedings, that that he would have to defend against the allegation that he committed the offense set forth in section 9-1(a)(1), (2), in that he shot Shields. The jury instructions confined the jury's attention to that theory.

¶ 147 Finally, we reject defendant's argument that the jury was likely confused by the instructions. As already discussed, the instructions accurately informed the jury of the law.

Defendant points to the trial court's misstatement when orally instructing the jury that, to sustain the firearm enhancement, the State had to prove that "during the commission of the offense of *attempt* first-degree murder the defendant personally discharged a firearm that proximately caused death to another person." (Emphasis added.) However, as noted, the trial court corrected this misstatement in its written instructions to the jury, an approach to which the attorneys for both sides acquiesced. See *People v. Mescall*, 379 Ill. App. 3d 670, 677 (2008) (defendant cannot complain of an error in instructions to which he acquiesced). No trial unfolds perfectly and there is no indication that this misstatement, which the trial court promptly corrected, combined with the discrepancy between Instruction Nos. 19 and 20, somehow rendered the instructions "conflicting and confusing *** as a whole."

¶ 148                                    G. Sentencing

¶ 149   Defendant argues that his 50-year sentence was excessive. Defendant acknowledges that he did not file a motion to reconsider sentence and, thus, his claim is forfeited. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). He argues, however, that his claim should be reviewed under the plain-error doctrine or as an ineffective assistance claim. We find no error and, therefore, we decline to do so.

¶ 150   First, defendant hints at but does not develop an argument pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Buffer*, 2019 IL 122327. Defendant recounts that, when sentencing a juvenile, the supreme court has held that a 40-year sentence constitutes a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶ 40 ("In determining when a juvenile defendant's prison term is long enough to be considered *de facto* life without parole, we choose to draw a line at 40 years"). Also, when sentencing a juvenile, the trial court must consider a set of factors codified in section 5-4.5-105 of the Unified Code of Corrections. 730 ILCS 5/5-4.5-105 (West 2016). These factors

include the person's age, impetuousness, and maturity at the time of the offense, including the ability to consider risks and consequences and the presence of cognitive or developmental disabilities. *Id.* Upon consideration of these factors, the trial court may decline to impose any applicable sentencing enhancement. *Id.*

¶ 151 Defendant acknowledges that he was not a juvenile at the time of the offense. He does not argue that the trial court should have declined to impose the firearms enhancement. Neither does he argue that the trial court should have imposed a sentence of less than the minimum 45 years, which qualifies as a *de facto* life sentence under *Buffer*. Indeed, this court has determined that *Miller* does not apply to sentences imposed on a defendant who was at least 18 at the time of the offense. *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 47. Defendant *appears* to argue that his sentence was unconstitutional as applied, but he does not use that terminology. To argue that a sentence is unconstitutional as applied, a defendant must have developed "an adequate factual record, that *[his] own specific characteristics were so like those of a juvenile* that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' " (Emphasis added.) *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25.

¶ 152 Here, defendant has not developed a record to show that his own specific characteristics were like those of a juvenile other than to argue, generally, that the crime itself appeared to be an act of impetuosity. Defendant argues: "[Defendant] seems to have been caught up in a situation brought on by his peers' collective decision to seek marijuana in an unfamiliar location and after consuming drugs and alcohol." This is insufficient to bring an as-applied *Miller* challenge. See, *e.g.*, *People v. Harris*, 2018 IL 121932, ¶¶ 45-46 (where the record is inadequate to address how

*Miller* applies to an 18-year-old defendant's circumstances, an unconstitutional as-applied challenge is premature).

¶ 153    Distilled, defendant's argument is merely that the trial court failed to consider his mental-health condition, youth, and rehabilitative potential. This is not a constitutional challenge under *Miller* but, rather, simply an argument that the trial court abused its discretion in sentencing defendant. See, *e.g.*, *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 61-63. This argument also fails.

¶ 154    In sentencing a defendant, the trial court must consider a defendant's rehabilitative potential, the seriousness of the offense, and the protection of the public. *People v. Young*, 124 Ill. 2d 147, 156 (1988). The trial court has great discretion to sentence a defendant within the statutory range and must consider the unique circumstances of the defendant and the offense. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). A sentence within the statutory limits will not be considered an abuse of discretion unless it is manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 155    Defendant recounts the facts and circumstances set forth in his presentencing report, as described in the background section of this disposition. Briefly, these include being raised without a father, being raised in a violent neighborhood, the absence of a criminal history, youth, and mental-health and drug-abuse issues. Defendant notes that mental-health conditions and addiction are significant mitigating factors, see, *e.g.*, *People v. Young*, 250 Ill. App. 3d 55, 65-66 (1993), and he contends that the trial court did not consider these factors.

¶ 156    We disagree. A trial court is not required to mention every mitigating factor and the weight assigned to each factor. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. There is a presumption that the trial court has considered all the relevant mitigating and aggravating factors, and that presumption will not be overcome absent explicit evidence in the record. *Id*. Here, the

court stated that it had read the presentence report. This statement supports the presumption that the court it considered defendant's mental-health history and drug-abuse issues.

¶ 157  Moreover, the trial court here made clear that it considered defendant's youth and future life upon release. It stated:

> "[Defendant] at the time of this offense had just turned 18 and I have to consider that as well. If it had been 17 when he committed this offense, I would be looking at many different factors as well that the Courts have required as the years have gone by to be considered, so I have to look at what I have in front of me as a young man of 18 years old."

It also commented that, even if it issued the minimum sentence of 45 years, defendant would be an older man upon release.

¶ 158  Finally, the court considered that defendant had no criminal history, going so far as to remark that this was unusual in a first-degree murder case. Thus, contrary to defendant's position, it cannot be said that the trial court failed to consider his youth, mental-health conditions, or rehabilitative potential. The trial court did not abuse its discretion in sentencing defendant to 50 years' imprisonment.

¶ 159                              III. CONCLUSION

¶ 160  For the reasons stated, we affirm the judgment of the trial court.

¶ 161  Affirmed.